REQUESTED BY: Senator Chris Abboud Nebraska State Legislature
You have requested our opinion as to the interpretation of the requirement in Neb.Rev.Stat. § 2-1229(c) (1991) that interstate simulcasting agreements be consented to by either the Horsemen's Benevolent and Protective Association ["HBPA"] "or other group representing the majority of horsepersons at the receiving track. ., Your specific question is whether such consent is required interstate simulcasting agreements are approved on occasions where. no live racing is being conducted at the receiving track.
You indicate that, depending on our answer to your question, you are contemplating introducing legislation on this subject.
Neb.Rev.Stat. § 2-1228 (1991) provides that a racetrack meeting certain criteria may apply for and receive a license to operate as an interstate simulcast facility. Section 2-1229 further provides that the State Racing Commission' may approve an application under § 2-1228 if certain conditions are met Among the conditions is that set forth in which requires a written agreement between the receiving track and the Bending track located outside of the state in any other state, territory, or possession of the United States, the District of Columbia, or the Commonwealth of Puerto Rico setting forth the division of all proceeds between the sending and receiving tracks and all other conditions under which such interstate simulcast will be conducted. Such written agreement shall have the consent of the group representing the majority of horsepersons racing at the sending track and of the Horsemen's Benevolent and Protective Association or other group representing the majority of horsepersons at the receiving track. (Emphasis added).
"In considering the meaning of a statute, courts should, if possible, discover legislative intent from the language of the act and give it effect." Peterson v. Minden Beef Co., 231 Neb. 18, 22,434 N.W.2d 681, (1989). In construing a statute, a "court must look at the statutory objective to be accomplished, the problem to be remedied, or the purpose to be served, and then place on the statute a reasonable construction which best achieves the purpose of the statute, rather than a construction defeating the statutory purpose." State v. Burnett,227 Neb. 351, 353, 417 N.W.2d 355, 357 (1988). "Effect must be given, if possible, to all the several parts of a statute. No sentence, clause, or word should be rejected as meaningless or superfluous if it can b e avoided." N. + Hybrids v. Growers Seed Ass'n, 219 Neb. 296, 299,363 N.W.2d 362, (1985). "As far as practicable, [the courts] must give effect Go the language of a statute and reconcile different statutory provisions so that parts of a statute are consistent, harmonious, and sensible." Rosnick v. vks, 218 Neb. 499, 501, 357 N.W.2d 186, (1984).
Applying these principles to the question presented, we believe that the language of § 2-1229(c) demonstrates a legislative intent to require approval of the HBPA or other group representing the majority of horsepersons at a receiving track prior to such racetrack being granted approval to conduct interstate simulcast racing. While it may, at first glance, seem anomalous to interpret this provision to require consent from a group representing horsepersons at a time when, because no live racing is being conducted, no such group may technically be said to be present at the racetrack, we believe this construction is consistent with the language of the statute and the purpose sought to be served by this provision. Significantly, while the last sentence of § 2-1229(c) requires the consent of the group representing the majority of horsepersons "racing" at the sending track, no similar reference to "racing" is made regarding the consent "of the group representing the majority of horsepersons at the receiving track." This consent requirement was evidently designed to grant horsepersons with a means to participate in the approval process for interstate simulcast racing, in recognition of the impact simulcasting could have on live racing in the state. The impact of simulcast racing of this nature is not limited solely to instances where live racing is also being conducted at a Nebraska racetrack in addition to interstate simulcasting. A sensible construction of this provision, which would give effect to the apparent intent of the Legislature, would be to construe the statute to require the consent of the HBPA or other group representing the majority of horsepersons at the time racing was last conducted at the proposed receiving track prior to Commission approval of interstate simulcasting at the facility.
This interpretation is supported by the legislative history surrounding the enactment of 1989 Neb. Laws, L.B. 591, the legislation authorizing interstate simulcasting. An examination of this history reveals that the final version of the bill was the result of a compromise designed to protect the viability of live horse racing in Nebraska. Initially, two bills were considered L.B., 736, which would have limited interstate simulcasting to the period during which live racing was conducted in the state; and L.B. 591, which authorized year-round interstate simulcasting. Committee Records on L.B. 591, 91st Neb. Leg., 1st Sess. 6-7 (March 13, 1989) (statement of Senator Rod Johnson). Eventually, L.B. 591 was, after amendment, endorsed by agreement of the Nebraska racetracks and representatives of the horse racing industry. Id. at 20 (statement of Bob Skochdopole. The testimony before the Committee on General Affairs reflects the consistent view that the consent of the HBPA or other group representing the majority of horsepersons at the receiving track was required prior to the Commission's approval of interstate simulcasting to be conducted at anytime, as opposed to only when the receiving track was also conducting live racing. Id. at 11-14 (statement of Senator Loran Schmit); 23-25, 28 (statement of Bob Skochdopole); and 36-37 (statement of Mike Kelley). This point was directly addressed in testimony presented by Mr. Skochdopole on behalf of the Thoroughbred Racing Association of Nebraska, the organization representing the state's five thoroughbred racetracks, who stated that interstate simulcasting would not be permitted without the approval of the organization representing an authority of the horsemen at both the sending and receiving track. This applies whether we're racing live or not. So we really give veto power to the Racing Commission, other racetracks, and the horsemen at the receiving and sending tracks, before we can conduct simulcasting. Either live or at the end.
Further, it is our understanding that this interpretation of the need for consent of the HBPA or other horsepersons group prior to Commission authorization of interstate simulcasting has been applied by the Commission in the past. Although construction of a statute by a department charged with enforcing it is not controlling, it is entitled to considerable weight, particularly when the Legislature has not acted to change the agency's interpretation. McCaul v. American Say. Co.,213 Neb. 841, 331 N.W.2d 795 (1983). While there appears to be some disagreement among the members of the Commission as to the continued acceptance of this construction, the prior Commission interpretation and application of this provision further supports our conclusion as to the construction of § 2-1229(c).
In conclusion, it is our opinion that, under § 2-1229(c), consent of the HBPA (or other group representing the majority of horsepersons at a receiving track) is necessary prior to Commission approval of an interstate simulcast agreement, even when the receiving track is not also conducting a live race meeting. As noted previously, the identity of such group should be determined by reference to the group which represented the majority of horsepersons at the last live race meeting conducted at the racetrack. We point out that, while we believe that this is the correct interpretation of this provision, the answer to this question is by no means clear. Therefore, we would suggest that, to the extent you wish to clarify the Legislature's intent in this regard, legislation on this subject would certainly be appropriate.
As a final matter, we note that, in your request, you make reference to the necessity of the "consent of the organization which represents a majority of the thoroughbred breeders in Nebraska and the organization which represents a majority of the owners and trainers at the racetrack of the licensee conducting the live race meeting" relative to the authorization of telephonic wagering under Neb.Rev.Stat. § 2-1239
(Cum. Supp. 1992). In your request, you appear to refer to this provision in connection with recent Commission action relating to "teleracing facilities'. As the statutory provision referred to above has no bearing on the question of the operation of "teleracing facilities", there is no need for us to attempt to respond to your question regarding this provision. We note that we have previously opined that authorization of "off-track betting" is contrary to Neb. Const. art. III, § 24. Op. Att'y Gen. No. 91026 (April 5, 1991).
Very truly yours,
 DON STENBERG Attorney General